# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# NORTHERN DIVISION

| | |
|---|---|
| XODUS MEDICAL, INC., ALESSIO PIGAZZI, and GLENN KEILAR, <br><br> Plaintiffs, <br><br> v. <br><br> PRIME MEDICAL, LLC., and SYMMETRY SURGICAL INC. <br><br> Defendants. | No. 3:18-cv-413-JPM |
| XODUS MEDICAL, INC., ALESSIO PIGAZZI, and GLENN KEILAR, <br><br> Plaintiffs, <br><br> v. <br><br> PRIME MEDICAL, LLC., and SYMMETRY SURGICAL INC. <br><br> Defendants. | No. 3:18-cv-414-JPM |
| XODUS MEDICAL, INC., ALESSIO PIGAZZI, and GLENN KEILAR, <br><br> Plaintiffs, <br><br> v. <br><br> G&T INDUSTRIES, INC. <br><br> Defendant. | No. 3:18-cv-415-JPM |

**ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF MR. IVAN T. HOFMANN**

Before the Court is Defendants Prime Medical, LLC, Symmetry Surgical, Inc., and G&T Industries, Inc.'s Motion to Exclude Opinions and Testimony of Mr. Ivan T. Hofmann, filed under seal on October 19, 2021. (ECF No. 259.) Plaintiffs filed a Response in Opposition on November 16, 2021. (ECF No. 289.) Defendants filed a Reply on November 22, 2021. (ECF No. 310.) For the reasons discussed below, Defendants' Motion is **DENIED**.

## I. BACKGROUND

This is a patent infringement case for technology "related to patient slippage within the [] context of the Trendelenburg position for surgery—when using a viscoelastic foam." (Claim Construction Order, ECF No. 138 at PageID 2894.) The asserted patents are U.S. Patent No. 8,511,314 (the "'314 Patent"), U.S. Patent No. 8,464,720 (the "'720 Patent"), and U.S. Patent No. 9,161,876 (the "'876 Patent"). (Id.) Mr. Ivan T. Hofmann ("Mr. Hofmann") is Plaintiffs' damages expert. (ECF No. 259 at PageID 6574.) Defendants seek to exclude both Mr. Hofmann's lost profits testimony as well as his opinion on a reasonable royalty. (Id.) Defendants contend that his opinion on lost profits should be excluded because "he fails to tie consumer demand for products to the patented features of those products," and he "does not establish . . . that, but for the alleged infringement, Plaintiffs would have made each and every sale made by Defendants." (Id. at PageID 6574–75.) Defendants seek to exclude Mr. Hofmann's reasonable royalty analysis because "Mr. Hofmann's royalty rate calculation of $20.00 represents a 141.8% increase to his $8.27 per unit 'starting point,' and he provided no explanation for this substantial increase." (Id. at PageID 6575.) Plaintiffs contend that "Prime's quibbles with Mr. Hofmann's opinion are, at most, the stuff of cross examination – not exclusion." (ECF No. 289 at PageID 8387.)

2

Case 3:18-cv-00413-JPM-HBG   Document 342   Filed 12/16/21   Page 2 of 12   PageID #: 9718

## II. LEGAL STANDARD

"[A] proposed expert's opinion is admissible, at the discretion of the trial court," if (1) the witness is qualified by "knowledge, skill, experience, training, or education"; (2) the witness's testimony is relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) the witness's testimony is reliable. In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). In evaluating the reliability of expert opinion testimony, a trial court must consider whether the testimony is based on "sufficient facts or data" and is the "product of reliable principles and methods," as well as whether the expert "has applied the principles and methods reliably to the facts of the case." See Fed. R. Evid. 702. "Such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community should be considered in this review." United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593–94 (1993)).

"The party offering the expert's testimony has the obligation to prove the expert's qualifications by a preponderance of the evidence." Burgett v. Troy-Bilt LLC, 579 F. App'x 372, 376 (6th Cir. 2014). That being said, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note, 2000 amend. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal Antitrust Litig., 527 F.3d at 529–30. "[M]ere weaknesses in the factual basis of an expert witness opinion bear on the weight of the evidence rather than on its admissibility." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000) (quoting

United States v. L.E. Cooke Co., 991 F.2d 336, 342 (6th Cir. 1993) (internal quotation marks and alterations omitted)).

## III.   ANALYSIS – LOST PROFITS

Defendants contend that Mr. Hofmann failed "to offer reliable testimony to meet his 'but for' causality burden regarding lost profit damages" because:

1) Mr. Hofmann fail[ed] to show the patented features, and not other relevant factors, are the sole driver of consumer demand for the products (Panduit Factor 1).
2) Mr. Hofmann did not address, much less analyze, numerous competing companies' Trendelenburg positioning products (Panduit Factor 2) in his expert report: (1) D.A. Surgical; (2) INP Medical; (3) Cardinal; and (4) Infinitus Medical.
3) Mr. Hofmann did not even try to establish manufacturing capacity (Panduit Factor 3) of Keystone Foam or Xodus
4) Mr. Hofmann failed to establish manufacturing or marketing capacity (Panduit Factor 3) for (1) the different shapes and sizes of STP products sold by Defendants that Xodus does not offer or (2) Defendants' relationships with customers.
5) Mr. Hofmann did not reliably calculate Xodus' alleged lost sales revenues (Panduit Factor 4) because he used Xodus' average sales price in his analysis and did not consider or make any adjustment to account for the blend of Accused STP Products (e.g., mix of types and sizes).
6) Mr. Hofmann did nothing more than assume that Prime Medical's customers would be willing to pay significantly higher prices (112.5% more) to purchase Xodus' product but for Defendants' alleged patent infringement.

(ECF No. 259 at PageID 6581–82.)

### A. Mr. Hofmann Has Satisfied the First Panduit Factor.

Defendants contend that Mr. Hofmann "failed to 'establish that [the non-patented] features do not cause consumers to purchase the product . . . [and] that the patented feature alone motivates customers to purchase the infringing product in the first place.'" (Id. at PageID 6584.) (citing Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 904 F.3d 965, 979 (Fed. Cir. 2018).)

4

In response, Plaintiffs contend that Defendants' "assertion that the first Panduit factor ties consumer demand to the patented features is incorrect." (ECF No. 289 at PageID 8389.) Instead, Plaintiffs contend that "[t]he demand requirement is met by proof of the patent holder's sale of the patented product: 'All a patentee must do is sell[] some item, the profits of which would have been lost due to infringing sales.'" (Id. at PageID 8390.) (citing Georgetown Rail Equip. Co. v. Holland LP, 867 F.3d 1229, 1241 (Fed. Cir. 2017).) In reply, Defendants reiterate that "Mr. Hofmann **did not** show the patented features, and not other relevant factors, drive consumer demand for the products." (ECF No. 310 at PageID 9217.) (emphasis in original.)

"The proper inquiry [for the first Panduit factor] asks whether demand existed in the marketplace for the patented product, i.e., a product 'covered by the patent in suit or that directly competes with the infringing device.'" Georgetown Rail Equip. Co., 867 F.3d at 1241 (citing DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1330 (Fed. Cir. 2009)). Defendants' cited standard requiring specific demand for the patented feature alone is the standard for the entire market value rule for apportionment of a reasonable royalty and as a result, does not apply to the first Panduit factor. See Power Integrations, Inc., 904 F.3d at 979 ("[T]he entire market value rule is appropriate only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts."). Here, Mr. Hofmann's expert report uses reliable methodology to show "demand in the marketplace for the patented product," and his testimony should not be excluded on this basis. (See ECF No. 259-2 at PageID 6712–15.) (explaining Mr. Hofmann's methodology for finding demand for the patented product.)

### B. Mr. Hofmann Had a Reliable Basis for His Conclusion that No Acceptable Non-Infringing Alternatives Exist.

Defendants contend that "Mr. Hofmann fails to address or even provide a conclusory opinion in an attempt to establish that customers would not have purchased viscoelastic foam

Trendelenburg positioning pads from Cardinal Health or similar competing products from the other three competitors in the market." (ECF No. 259 at PageID 6585–86.) Plaintiffs respond, however, that Defendants are "ask[ing] the Court to find that four competing positioning pads by Cardinal Health, D.A. Surgical, INP Medical, and Infinitus Medical are acceptable non-infringing alternatives." (ECF No. 289 at PageID 8391.) Plaintiffs contend that Mr. Hofmann "explains the basis for his understanding that competing products using alternative technologies do not have the benefits of the patented product's features and, therefore, that they are not acceptable substitutes." (Id. at PageID 8392.) In reply, Defendants assert that "the facts establish that Mr. Hofmann failed to address or even provide a conclusory opinion in an attempt to establish that customers would not have purchased foam positioning pads from Cardinal Health or similar competing products from the other three competitors in the market." ECF No. 310 at PageID 9218.)

The second Panduit factor requires the patent owner to prove the "absence of acceptable noninfringing substitutes." Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978). Overall, Mr. Hofmann's report provides a discussion of other products in the market and why, in his opinion, these are not acceptable non-infringing alternatives. (See ECF No. 259-2 at PageID 6715–20.) Whether Mr. Hofmann's conclusion that there are no acceptable non-infringing alternatives is correct is a factual dispute, but it does not merit exclusion of his testimony.

### C. Mr. Hofmann's Opinion Provides Reliable Testimony to Establish Manufacturing Capacity.

Defendants contend that "Mr. Hofmann did not conduct any analysis of the manufacturing capacity of either Keystone Foam (Xodus' fabricator that cuts the foam and adds rail straps) or Xodus itself (which assembles, packages, and ships the products)." (ECF No. 259 at PageID 6587.) In response, Plaintiffs contend that "manufacturing capacity can properly be inferred from

6

the patent holder's history of meeting demand" and that "[m]anufacturing capacity can also be shown by testimony about the patent holder's history of increasing capacity to meet rapid growth." (ECF No. 289 at PageID 8394.) In reply, Defendants assert that Mr. Hofmann fails to take into account additional considerations besides "volume increases" to establish manufacturing and marketing capability: "For example, Mr. Hofmann does not consider how Xodus could have manufactured, marketed, and sold Pink Pad and Pink Pad XL products to Defendants' customers who purchased alternative versions of Accused STP Products that include features not offered by Xodus." (ECF No. 310 at PageID 9219.)

The third Panduit factor requires the patent owner to prove "manufacturing and marketing capability to exploit the demand." Panduit Corp., 575 F.2d at 1156. A jury can "reasonably infer manufacturing capacity from [a patent holder]'s prior activities." TEK Global, SRL v. Sealant Sys. Int'l, Inc., 920 F.3d 777, 790 (Fed. Cir. 2019). Mr. Hofmann's report demonstrates a reliable analysis of Xodus's and Xodus's foam supplier's capability to meet demand by using Xodus's past activities in the market. (See ECF No. 259-2 at PageID 6721–23.) Whether Mr. Hofmann's analysis overcomes Defendants' contention that Xodus could not have met demand for Defendants' products that have additional features is a matter better left to cross-examination rather than warranting exclusion of his opinion.

**D. Mr. Hofmann's Lost Sales Calculation is Sufficiently Reliable.**

Defendants contend that Mr. Hofmann's lost sales analysis is unreliable because "he used Xodus' average sales price in his analysis and did not consider or make any adjustment to account for the blend of Accused STP Products (e.g., mix of types and sizes)." (ECF No. 259 at PageID 6589.) Defendants assert that Mr. Hofmann failed to take into account differences between Xodus's products and their own:

7

> For example, Mr. Hofmann assumed, without basis, that customers who purchased Prime Medical pediatric pads, 200-series pads, and/or 150-series pads (which come in different thicknesses than the Pink Pads) would have purchased either an Xodus Pink Pad or Pink Pad XL, if Prime Medical or Symmetry was not available to make the sales. Xodus does not offer the same shapes or sizes as Prime Medical's STP pads. Further Mr. Hofmann did not consider the fact that Prime Medical and Symmetry sold STP100 products that did not include straps, which Xodus did not offer. Mr. Hofmann also assumed, without basis, that those customers would have purchased Pink Pad or Pink Pad XL products that included straps and a lift sheet.
>
> Most drastically, Mr. Hofmann did not consider that a portion of Accused STP Products included wings, which is an STP product that includes additional memory foam padding that protrudes from the sides of the same pad—another feature that Xodus does not offer. Mr. Hofmann did not account for this in his lost profits analysis.

(Id.) Plaintiffs, however, contend that, "[h]ere, the fact that Prime offered non-royalty bearing infringing products of different shapes and sizes, at a lower price, is irrelevant," and instead, "[w]hat is relevant is whether customers would have been willing to buy the Xodus products at Xodus' then-current price in order to have the advantages of the patented technology." (ECF No. 289 at PageID 8400.) In reply, Defendants reiterate that "Mr. Hofmann did not consider how Xodus would have successfully sold a different product to each of Prime Medical's or Symmetry's customers that were accustomed to the various Accused STP Products." (ECF No. 310 at PageID 9219.)

Defendants do not cite to any legal authority in their Motion to support why Mr. Hofmann must take into account these differences between Plaintiff's products and the accused products. (See ECF No. 259 at PageID 6589–90.) The Federal Circuit has held that customer preference for factors such as "more customized work" and being "more accommodating to prospective customers than [the patent owner] . . . does not tend to show that [the patent owner] would not have made the sale had [the defendant] not infringed." Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1143 (Fed. Cir. 1991). In Kaufman Co., the Federal Circuit held that, had the defendant

8

not infringed, "there would be no other supplier of [the accused product] that customers could prefer over [the patent owner's product]." Id. Here, similarly, the fact that Mr. Hofmann did not take into account customer preference for additional features of the accused products does not merit exclusion and such a requirement would be counter to Federal Circuit precedent.

    **E. Mr. Hofmann Provided Sufficient Methodology to Show Prime Medical's Customers Would Pay Xodus's Higher Prices.**

Finally, Defendants contend that Mr. Hofmann's lost profits analysis should be excluded because "Mr. Hofmann has failed to provide adequate support for his assumption that Prime Medical's customers would be willing to pay significantly higher prices." (ECF No. 259 at PageID 6591.) Defendants contend that "[l]ost profits must be proved on a customer-by-customer basis" and that "Mr. Hofmann has not established that *any* specific customer of the Defendants, much less *all* of them, would have bought Plaintiffs' Pink Pads but for the allegedly infringing conduct of Defendants." (Id. at PageID 6590.) In response, Plaintiffs contend that based on facts in the record, "Mr. Hofmann concluded the difference in price was more than made up for by the cost of the time saved in the operating room, considering that it costs approximately $100 per minute to run an operating room, whereas Xodus sells the Pink Pad for $67.76 and the Pink Pad XL for $85.17." (ECF No. 289 at PageID 8397.) Additionally, Plaintiffs contend that "[n]o authority requires Mr. Hofmann – let alone Xodus – to prove what 'each individual customer' would have done if Prime were not in the market." (Id. at PageID 8398.) In reply, Defendants reiterate that "Mr. Hofmann **did not** conduct any analysis of elasticity of demand in order to determine the potentially significant negative impact on the number of units sold if the price was more than doubled." (ECF No. 310 at PageID 9217.) (emphasis in original.)

Defendants cite to Mentor Graphics to support their contention that lost profits must be proven on a customer-by-customer basis. (See ECF No. 259 at PageID 6590.) However, that

9

sentence in Mentor Graphics related to the second Panduit factor, absence of non-infringing alternatives, for which, as discussed above, Mr. Hofmann has met the threshold of reliability. See Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1286 (Fed. Cir. 2017) ("The second factor, absence of non-infringing alternatives, often proves the most difficult obstacle . . . . And this determination is made on a customer-by-customer basis.").

Similarly, Defendants have not shown that Plaintiffs and Defendants operate in completely different market segments, so this contention also does not establish that Mr. Hofmann's Panduit analysis is unreliable. (See ECF No. 259 at PageID 6590.) As a result, Mr. Hofmann's analysis under Panduit is distinguishable from the court's lost profits analysis in BIC, where the Federal Circuit determined the Panduit test could not even be used. See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218–19 (Fed. Cir. 1993) ("The first Panduit factor—demand for the patented product . . . assumes that the patent owner and the infringer sell substantially the same product."). Here, Mr. Hofmann's analysis uses reliable methodology to show that the Parties sell similar products in the same market. (See ECF No. 259-2 at PageID 6723–24.) (citing Mr. Holladay's deposition and Defendants' marketing materials to show that Defendants targeted Xodus's customers.) Additionally, Mr. Hofmann provides analysis as to why he opined that Defendants' customers would have paid the higher price of Xodus's products. (See id. at PageID 6724–25.) As a result, Mr. Hofmann's testimony should not be excluded on this basis.

As a final note, Defendants contend that Plaintiffs admit Mr. Hofmann's testimony fails to establish but-for causation. (ECF No. 310 at PageID 9215.) However, use of the Panduit factors is one accepted way to prove "but for" causation. Mentor Graphics, 851 F.3d at 1284. Mr. Hofmann's report uses the Panduit factors to establish his lost profits opinion, and as discussed above, each of Defendants' contentions fail to show that Mr. Hofmann's opinion does not "rest[]

10

upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal Antitrust Litig., 527 F.3d at 529–30. As a result, Defendants' motion to exclude Mr. Hofmann's lost profits opinion is **DENIED**.

IV.   **ANALYSIS – REASONABLE ROYALTY**

Defendants contend that Mr. Hofmann's testimony on a reasonable royalty should be excluded because "Mr. Hofmann opined Xodus would demand a royalty rate of $20.00 per Accused Product, without any quantitative data to support that opinion." (ECF No. 259 at PageID 6591–92.) Defendants assert that "Mr. Hofmann's royalty rate calculation of $20.00 represents a 141.8% increase to his $8.27 per unit 'starting point,' and that "Mr. Hofmann provided no explanation for this $11.73 increase to his 'starting point' of an $8.27 per unit royalty rate." (Id. at PageID 6592.) In response, Plaintiffs contend that, to arrive at that rate, Mr. Hofmann used Defendants' profit margins and that "Mr. Hofmann's use of Prime's net profit margin as the maximum is reliably based on the record facts and squarely within the bounds of the law." (ECF No. 289 at PageID 8405.) Plaintiffs also assert that "Prime's chief complaint is that Mr. Hofmann did not provide a formula showing how he arrived at his reasonable royalty opinion of $20 per unit" and that, in using this as the basis for the Motion to Exclude, "Prime demands more than the law requires." (Id.) In reply, Defendants reiterate that "Mr. Hofmann failed to provide any quantitative analysis for the 141.8% increase to his starting point in the Richmond / Xodus agreement, so that Defendants could recreate, test, and challenge these opinions." (ECF No. 310 at PageID 9220.)

The Federal Circuit does "not require that witnesses use any or all of the Georgia-Pacific factors when testifying about damages in patent cases." Whitserve, LLC v. Comput. Packages, Inc., 694 F.3d 10, 31 (Fed. Cir. 2012). If an expert does use the Georgia-Pacific factors, "reciting

11

each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration." Id. "[W]hile mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed." Id. Here, Mr. Hofmann's analysis of the Georgia-Pacific factors is more than conclusory—there is analysis determining whether the particular factor would affect the royalty rate, using specific facts and a discussion of how great that effect would be. (See ECF No. 259-2 at PageID 6735–50.) Further, Mr. Hofmann's proposed royalty rate is closely tied to Defendants' profits on the accused products and his determination that there would be "substantial upward pressure" based on his Georgia-Pacific factor analysis. (Id. at PageID 6751.) Thus, Mr. Hofmann's analysis is distinguishable from that of the expert in Whitserve. 694 F.3d at 32 ("The record contains no evidence regarding CPi's expected profit margins that would explain how Dr. Shapiro converted a percent of profit royalty rate into one applied to a percent of revenue."). As a result, Defendants' motion to exclude Mr. Hofmann's opinions regarding a reasonable royalty is **DENIED**.

IV. **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Exclude Opinions and Expert Testimony of Mr. Ivan T. Hofmann is **DENIED**.

**IT IS SO ORDERED**, this 16th day of December, 2021.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE